# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:21-cr-440 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| AARON JAMES, | ) | |
| | ) | |
| | ) | |
| DEFENDANT. | ) | |

Before the Court is the motion of defendant Aaron James ("James") to suppress the fruits of the November 20, 2020 search of a multi-unit residential structure in Cleveland Heights, Ohio. (Doc. No. 24 (Motion).) Plaintiff United States of America (the "government") opposes the motion (Doc. No. 27 (Response), and James has filed a reply. (Doc. No. 28 (Reply).) On February 11, 2022, the Court conducted a hearing on the motion. At the conclusion of the hearing, the Court took the matter under advisement.

## I.  BACKGROUND

The search in question was executed pursuant to a warrant issued by a judge of the Cuyahoga County Court of Common Pleas. (Doc. No. 24-1 (Search Warrant).) The search warrant, in turn, was supported by an affidavit sworn by Special Agent Jared Prill ("S.A. Prill") of the Ohio Bureau of Criminal Investigation ("BCI"). (Doc. No. 24-1, Ex. A (Affidavit).) S.A. Prill, a law enforcement officer with fifteen years of service, averred that he had received "specialized training and experience in the detection, recognition, packaging, selling and

manufacturing of controlled substances and dangerous drugs[.]" (Doc. No. 24-1 at 3[1].) In the introduction to his affidavit, he described the premises to be searched as "1698 and 1696 Coventry Road, Cleveland Heights, Ohio 44118 and more fully described as the first and second floor units of a three-story multifamily residence located north of Mayfield Road and south of Avondale Avenue on the west side of the street." (*Id.*)

> With respect to the suspected drug trafficking activities of James, the affidavit provided:
>
> Since 2018 investigators have known Aaron James to be associated with multiple illegal marijuana grow operators in the State of Michigan all owned by suspect Mark Brant. James has been identified through physical surveillance at facilities located at 6360 St. Anthony Road and 9760 Head O Lakes Drive in Ottawa Lake, Michigan. James is further connected to these locations through utility records and from multiple registered confidential informants who have provided investigators with information related to James' involvement in the cultivation, manufacturing and distribution of narcotics in the State of Ohio produced from the identified locations in the State of Michigan. The primary source of supply associated with James and his associates is the Island Resort LLC a business owned by suspect Mark Brant.

(*Id.* ¶ 1.) The affidavit then detailed the illegal marijuana grow facilities in Michigan operated by Brant, including the Island Resort LLC, and noted that these facilities "have been a routine source of supply for drug dealers in Northeast Ohio." (*Id.* ¶ 2; *see id.* ¶¶ 5–6.) The affidavit further provided that the existence of these operations and their connection to Ohio drug traffickers including James, was confirmed through the execution of numerous searches and

---

[1] All page number references herein are to the consecutive page numbers applied to each individual document by the Court's electronic docketing system.

vehicle interdictions in Michigan and Ohio. (*Id.* ¶¶ 2–3, 5–6.) With respect to these searches, the affidavit provided:

> The most recent of these enforcement activities included Federal search warrants executed in Summit County, Ohio and the State of Michigan on November 6th, 2020 that resulted in approximately 147 pounds of edible THC based products, approximately thirty pounds of marijuana plant material, and approximately $47,000 in United States Currency being seized. These illegal items were known to be sourced from the Island Resort LLC and were transported to Ohio by James Eubanks a known associate of Aaron James who had been observed traveling from Head O Lakes to Aaron James residence on Coventry Road in the [sic] Cleveland Heights, Ohio on or about Friday, October 31st, 2020.

(*Id.* ¶ 4.)

The affidavit also provided that a "confidential informant" had supplied "detailed information related to James' [drug] cultivation and distribution efforts[,]" including a June 2020 purchase of THC extraction equipment and an October 27, 2020 harvest of marijuana plants to be processed into THC distillate. (*Id.* ¶ 6.) It also contained information involving an Instagram social media account that James maintained for the sale of THC-based items that he manufactures and distributes "regularly through Northern Ohio." (*Id.* ¶ 7.) As evidence that the source of James' income was the illegal sale of the drugs featured in his social media account, the affidavit noted that James had no legitimate source of income and yet had recently purchased a "2020 Ford F150 King Ranch," and was paying high utility bills at multiple locations. (*Id.* ¶ 9.)

Further tying James' Michigan drug cultivation activities to his Coventry Road address in Cleveland Heights, Ohio, the affiant averred:

> James is known to investigators to travel back and forth from the State of Michigan to Cuyahoga County, Ohio on almost a weekly basis. This has been supported through electronic surveillance efforts and was further supported by a confidential informant on November 17th, 2020. This method of operation has been observed by other individuals who utilized Mark Brant's properties for their source of supply and are currently awaiting charges and/or under indictment after

3

they have been found to be involved in drug trafficking activities. Electronic surveillance further identified James and his vehicle at the Coventry Street address on November 18th, 2020.

(*Id*. ¶ 8.)

The affidavit also connected James to a second individual, Zoli Saunt ("Saunt"). According to the affiant, James was a known associate of Saunt, and that it was "further known to a reliable and credible confidential informant of the Cleveland FBI to be involved in the distribution of bulk amounts of marijuana and/or THC based products." (*Id*. ¶ 10.) The affiant averred that "[b]oth James and Saunt reside in the multifamily residence of 1696 and 1698 Coventry Road. Though there are different addresses associated with this residence [sic] is known to be one residential structure." (*Id*.) However, the affidavit also provided that "according to tenant informant" on file with the City of Cleveland Heights, "Aaron James utilize [sic] the address of 1698 Coventry Road and [] suspect Zoli Saunt utilizes the address of 1696 Coventry Road, however, both of these addresses are part of the same residential structure and that evidence suggest [sic] both of these known associates are involved in the distribution of narcotics in Cuyahoga County, Ohio." (*Id*. ¶ 17.)

Additionally, the affiant recounted recent suspected drug trafficking activity at the multi-unit residential structure:

On November 16th, 2020 electronic surveillance identified an unknown male approach the side door of the residence at 1622 hours. The male is wearing a hooded sweatshirt that appears to having [sic] nothing in the pocket at the time of his arrival. Approximately twenty minutes later the same individual is observed leaving this residence this time carrying a large bulging item in the pocket of his sweatshirt. This in and out behavior is consistent with individuals engaged in narcotics trafficking.

\*\*\*

On November 18th, 2020 electronic surveillance of the residence confirmed that both James and Saunt were at the residence together and the two were observed interacting with one [sic] throughout the day. Furthermore, both males were observed utilizing the same side door of the residence. Affiant suspects that since James frequently travels back and forth from Cuyahoga County, Ohio to the source of supply in the State of Michigan that it would be likely an associate of his in Ohio would reside at or near the same residence that James utilizes in order to watch over his operation. It is believed that Saunt fulfills this role for James and distributes illegal narcotics obtained from James.

Additionally, on November 18th, 2020 while Saunt and James were both at the residence a dark color SUV is observed arriving at approximately 1714 hours. An unknown male carrying what appears to be an empty back pack is observed going to the side door of the residence and is let inside the home. Approximately ten minutes later the same individual is observed leaving the residence carrying the same back pack. This short visit in and out of the residence while James and Saunt were both at the aforementioned address was indicative of a drug trafficking offense.

(*Id*. ¶¶ 13, 15–16.)

Finally, the affidavit discussed three trash pulls that were performed outside the Coventry residential structure that yielded evidence tying Saunt, alone, to the residence and the distribution of narcotics. (*Id*. ¶¶ 11, 12, 14.) In addition to identifying Saunt as a resident of 1696 Coventry Road, the trash pulls revealed "multiple packages that had previously contained suspected marijuana and/or THC related items[,]" "empty packaging material and cut vacuum sealed bags that previously contained marijuana[,]" and "packaging materials" associated with the "distribution of marijuana[.]" (*Id*.) The affidavit did not suggest that any of the trash pulls revealed evidence relating to the unit at 1698 Coventry or to James.[2]

The resulting search yielded evidence of drug trafficking from 1696 Coventry and 1698 Coventry. From James' residence (1698 Coventry), officers discovered a significant amount of

---

[2] The second to last paragraph in the affidavit addressed the unit on the third floor of the residential structure and explained why the affiant was not seeking permission to search that unit at that time. (*Id*. ¶ 18.) It is undisputed that law enforcement did not search the unit on the third floor.

marijuana and oils and resins containing THC, including other evidence of drug trafficking. From Saunt's residence (1696 Coventry), officers seized THC-related evidence, as well as more than 1,000 doses of LSD and numerous firearms.

James is charged in this matter with conspiracy to distribute and possession with intent to distribute a controlled substance, in violation of 21 U.S.C. § 846, and possession with intent to distribute a controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). (Doc. No. 11 (Indictment).) Saunt is charged in a separate criminal action with one count of possession with intent to distribute a controlled substance. (*United States vs. Zoli Saunt*, N.D. Ohio Case No. 1:21-cr-439, Doc. No. 11 (Indictment).) James now seeks to suppress all evidence seized from 1698 Coventry.

## II.  LAW AND DISCUSSION

The Fourth Amendment mandates that there must be probable cause for any search and seizure. U.S. Const. Amend. IV. "Probable cause has been defined as 'reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.'" *United States v. Padro,* 52 F.3d 120, 122–23 (6th Cir. 1995) (quoting *United States v. Bennett,* 905 F.2d 931, 934 (6th Cir. 1990)). "To demonstrate probable cause to justify the issuance of a search warrant, an affidavit must contain facts that indicate a fair probability that evidence of a crime will be located on the premises of the proposed search." *United States v. Frazier,* 423 F.3d 526, 531 (6th Cir. 2005) (internal quotation marks and citation omitted). "Probable cause is based on the totality of the circumstances; it is a 'practical, non-technical concept that deals with the factual and practical considerations of everyday life.'" *United States v. Abboud,* 438 F.3d 554, 571 (6th Cir. 2006) (quoting *Frazier,* 423 F.3d at 531).

"With great deference toward the issuing judge's determination, federal courts examine the affidavit's four corners to determine whether, under the totality of the circumstances, the low bar of probable cause has been overcome." *United States v. Moore*, 999 F.3d 993, 996 (6th Cir. 2021) (citations omitted); *see Whiteley v. Warden,* 401 U.S. 560, 565 n.8, 91 S. Ct. 1031, 28 L. Ed. 2d 306 (1971); *Aguilar v. Texas,* 378 U.S. 108, 109 n.1, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964), *abrogated on other grounds by Illinois v. Gates,* 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983). The affidavit is "judged on the adequacy of what it does contain, not on what it lacks, or what a critic might say should have been added." *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000).

Even if probable cause is lacking to support the issuance of a search warrant, a search may still be upheld under the good faith exception articulated in *United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984). Under this exception, the exclusionary rule will not apply to bar the admission of evidence seized in violation of the Fourth Amendment where the officers had a "good-faith reliance on a search warrant that is subsequently held to be defective." *United States v. Weaver*, 99 F.3d 1372, 1380 (6th Cir. 1996) (quoting *Leon*, 468 U.S. at 905). The "good-faith inquiry is confined to the objectively ascertainable question of whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization. In making this determination, all of the circumstances . . . may be considered." *Leon*, 468 U.S. at 922–23 n.23.

The good-faith defense will not apply, however, where: (1) the supporting affidavit contains information the affiant knew or should have known is false; (2) the issuing magistrate lacked neutrality and detachment; (3) the affidavit is devoid of information that would support a

probable cause determination making any belief that probable cause exists completely unreasonable; or (4) the warrant is facially deficient. *Leon*, 468 U.S. at 923; *United States v. Helton*, 314 F.3d 812, 824 (6th Cir. 2003) (citations omitted). It is James' position that the search warrant was not supported by probable cause, and further that *Leon's* good faith exception is not available to rescue what he believes was an otherwise illegal search.

> ### A.      Confidential Informants

The affidavit in support of the search warrant relied, in part, on information gleaned from confidential informants. James complains that the affiant does not aver that the confidential informants were reliable or that their information was sufficiently corroborated by other investigative techniques. (Doc. No. 28 at 2.)

"Officers rely on confidential informants with some frequency to procure information to support a request for a search warrant." *Moore*, 999 F.3d at 997 (citing *United States v. Crawford*, 943 F.3d 297, 302 (6th Cir. 2019)). Where an affidavit relies heavily upon information from a confidential source, "a court must consider the veracity, reliability, and the basis of knowledge for that information as part of the totality of the circumstances analysis." *United States v. Coffee,* 434 F.3d 887, 893 (6th Cir. 2006) (citing *Frazier,* 423 F.3d at 532). "As long as the issuing judge can conclude independently that the information is reliable, an affidavit based on the informant's tip will support a finding of probable cause." *United States v. McCraven,* 401 F.3d 693, 697 (6th Cir. 2005). "[A]n affidavit that supplies little information concerning an informant's reliability may [still] support a finding of probable cause, under the totality of the circumstances, if it includes corroborating information." *United States v. Woosley,* 361 F.3d 924, 926 (6th Cir. 2004); *see also United States v. Keeling*, 783 F. App'x 517, 522 (6th

Cir. 2019) (observing that even "vague and conclusory statements" from an informant can aid a finding of probable cause if the informant's credibility is sufficiently corroborated).

The affidavit made reference to multiple confidential informants who have provided information over the course of the investigation regarding the drug cultivation and distribution activity in Michigan and Ohio, and, in particular, James' connection to those activities. (*See, e.g.,* Doc. No. 24-1, Ex. A, ¶ 1.) While the affidavit did not refer to these informants using the word "reliable,"[3] or otherwise provide that the confidential informants have given reliable information in the past, the affidavit sufficiently detailed how the information provided through confidential sources was corroborated.[4]

For example, paragraph 5 of the affidavit stated that each of the 20 individual houses and buildings in the Island Resort LLC, a gated community associated with Brant and James, "have been found to support Ohio drug traffickers in procuring and manufacturing their supply." (*Id*. ¶ 5.) This paragraph further stated that this information "has been supported by six different confidential informants of Federal and State Law Enforcement who have each supported the observations made by law enforcement during the investigation." (*Id*.) The similar details provided by six different individuals "tends to support the reliability and credibility of all the

---

[3] In paragraph 10, the affiant referred to a confidential informant as "reliable and credible" but offered no information regarding the affiant's relationship with the informant, his history as an informant, or even the basis for the conclusion that the informant was reliable and credible. (*Id*. ¶ 10.)

[4] At the hearing, counsel debated the significance of the use of the phrase "registered confidential informants." (*See, e.g*., ¶¶ 1, 7.) While the government speculated that an agency such as the FBI would not "register" an informant who was not reliable, the Court finds that the fact that an informant was registered with a particular law enforcement organization sheds little light on the informant's reliability or history of providing reliable information. *See, e.g., United States v. Turner*, No. 18-20662, 2019 WL 1292586, at *7 (E.D. Mich. Mar. 21, 2019) (noting that registrations do not "make a [confidential informant] reliable, and the lack of registration does not make a [confidential informant] unreliable") (citing internal record).

information."[5] *United States v. Harden*, No. 2:20-cr-20280, 2021 WL 5506439, at *5 (E.D. Mich. Nov. 24, 2021) (citing *United States v. Alford*, No. 16-cr-20003, 2016 WL 10922897, at *4 (W.D. Tenn. June 17, 2016), *aff'd*, 717 F. App'x (6th Cir. 2017) (warrant was supported by probable cause where '[t]he affidavit . . . contained multiple anonymous tips reporting previous drug activity at [d]efendant's residence and a named informant describing a drug transaction at the same location close in time to the submission of the affidavit")); *see United States v. Taylor*, No. 1:07-cr-68, 2007 WL 1115194, at *7 (N.D. Ohio Apr. 13, 2007), *aff'd*, 471 F. App'x 499 (6th Cir. 2012) ("The consistency of each informant's statement with that of the others' indicates the overall reliability of the individual sources."); *see also United States v. Martinez*, 106 F.3d 402 (Table) (per curiam), 1997 WL 26461, at *1 (6th Cir. Jan. 22, 1997) (noting that "[t]he six different sources corroborated one another's stories").

Paragraph 5 also illustrates the fact that much of the information received from confidential sources was later confirmed during the course of the police investigation. (*Id.* ¶ 5 (noting that the informant's observations relating to the Island Resort LLC "supported the observations made by law enforcement during the investigation)".) Elsewhere in the affidavit, the affiant explained that a confidential informant's information regarding James' weekly travel between Michigan and Ohio was corroborated by electronic surveillance of James and others suspected of trafficking drugs from Brant's facilities. (*Id.* ¶ 8.)

Through a variety of police investigative techniques—including surveillance, searches, vehicle interdictions, and reviews of social media—much of the information received from

---

[5] James' association with Brant's illegal grow operations, including the facilities located at 6360 St. Anthony Road and 9760 Head O Lakes Drive in Ottawa Lake, Michigan, was also confirmed by "multiple registered confidential informants[.]" (*Id.* ¶ 1.) A review of utility records provided a further check on the information offered by these informants. (*Id.*)

confidential informants regarding James' suspected illegal activities as a drug distributor and trafficker was confirmed. While the affidavit did not specifically speak to the informants' credibility or track records as informants, the information they provided was subsequently corroborated during the investigation. The Court finds that the issuing judge could "conclude independently that the informant[s] [are] reliable[.]" *McCraven*, 401 F.3d at 697. Accordingly, the information was sufficient to support a finding of probable cause.

**B.     Nexus Between Drug Trafficking and 1698 Coventry**

James next argues that the affidavit was devoid of any evidence connecting his residence (1698 Coventry) to drug trafficking. In particular, he complains that the trash pulls revealed no evidence implicating James in *any* illegal activity, and, at best, the evidence obtained through the trash pulls only suggested possible personal recreational use of marijuana and THC-based products by Saunt. (Doc. No. 24 at 7–12.)

"To justify a search, the circumstances must indicate why evidence of illegal activity will be found 'in a particular place,'" as opposed to some other place. *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc). In other words, "there must be a nexus between the place to be searched and the evidence sought". *Id.* The nexus requirement does not dictate that officers have unassailable, direct knowledge that evidence of illegal activity will be found in the location to be searched. Rather, as is the case with all probable cause inquires, officers need only present the issuing judge with sufficient evidence to allow for a "practical, common-sense" conclusion that "there is a fair probability that contraband or evidence of a crime will be found [at the residence at issue]. *United States Washington*, 380 F.3d 236, 240 (6th Cir. 2004) (quoting *Carpenter*, 360 F.3d at 594).

Courts within the Sixth and other circuits have struggled with the issue of whether probable cause exists to search a suspected drug dealer's residence merely because the drug dealer resides there. The Sixth Circuit recently explored the source of this confusion in an opinion in *United States v. Reed*, 993 F.3d 441 (6th Cir. 2021). The court in *Reed* explained that the recurring debate over the sufficiency of the evidence needed to search a drug dealer's home is fueled by two competing Fourth Amendment principles. *Id*. 993 F.3d at 444. The first principle provides that "probable cause to arrest a suspect does not necessarily create probable cause to search the suspect's home." *Id*. at 447 (citing *United States v. Baker*, 976 F.3d 636, 645–46 (6th Cir. 2020)). "Rather, the arrest and search inquires ask different questions: whether there is a fair probability that a person has committed a crime versus a fair probability that the person's home will contain evidence of one." *Id* (citation omitted).

The second principle, the court in *Reed* explained, is that "the probable-cause test allows officers to make common-sense conclusions about where people hide things." *Id*. at 444. "So many courts have acknowledged as a common-sense matter that a suspect's home often will be a likely place that the suspect has kept evidence of a crime." *Id.* at 447 (citing *United States v. Williams*, 554 F.3d 683, 688 (6th Cir. 2008) (collecting cases)). "All things being equal [therefore], 'it is reasonable . . . to assume that a person keeps his possessions where he resides." *Id*. (quotation marks and citation omitted).

The tension between these two principles has "pulled courts in both directions when they have tried to answer this nexus question. The result? Courts have drawn fine lines between cases with 'little to distinguish' those that find probable cause from those that do not." *Id*. (quoting *United States v. Sacova*, 761 F.2d 292, 298 (6th Cir. 1985)). For example, the Sixth Circuit has

rejected the proposition that the defendant's "status as a drug dealer, standing alone, gives rise to a fair probability that drugs will be found in his home." *United States v. Brown*, 828 F.3d 375, 383 (6th Cir. 2016) (quoting *United States v. Fraizer*, 423 F.3d 526, 533 (6th Cir. 2005)). But the Sixth Circuit has also recently observed that, "[i]n the case of drug dealers, evidence is likely to be found where the dealers live." *United States v. Sumlin*, 956 F.3d 879, 886 (6th Cir. 2020) (quotation marks and citation omitted).

Given the strain between these competing principles, the court in *Reed* "reconciled [its] caselaw in fact-specific ways." *Reed*, 993 F.3d at 448. It accomplished this by holding that "a court need not rely on a known drug dealer's status *alone* whenever other evidence (besides the dealer's living there) links drug dealing to the dealer's home." *Id.* (emphasis in original). Thus, the question this Court must answer is whether there is "other evidence" (besides James' status as an alleged drug dealer, and the fact that he lived at 1698 Coventry) that links James' alleged drug dealing to the residence. The Court finds that such evidence exists.

First, the affidavit provided that James relied on the Michigan cultivation and manufacturing operations as his primary source of supply for his suspected drug trafficking. (Doc. No. 24-1, Ex. A, ¶ 1; *see also* ¶¶ 2, 5.) The affidavit further provided that James was known to investigators to travel back and forth from the Michigan properties to his residence (1696 Coventry) on a weekly basis (*id.* ¶ 8), and that this type of travel was consistent with drug trafficking activities (*id.*), as confirmed by searches and vehicle interdictions of other drug traffickers associated with the same Michigan operations and known to sell in Ohio. (*Id.* ¶¶ 3–5.)

For example, paragraph 3 of the affidavit provided:

[I]nvestigators have conducted four vehicle interdiction stops during the course of the investigation that has also seized bulk quantities of narcotics that had been

> sourced from the real estate owned by Mark Brandt by residents of the State of Ohio. These source sites include the Island Resort LLC at which James maintains illegal grow operations and a THC extraction lab.

(*Id*. ¶ 3.) While defense counsel offered his own spin on this paragraph by suggesting without any showing of proof (as discussed *infra*) that the grow operations in Michigan were somehow legal, counsel admitted that the remainder of the paragraph was accurate. Accordingly, James conceded that investigators had tangible proof that James and others were involved in cultivating marijuana in Michigan and then transporting the drugs to Ohio for sale.

In fact, there was evidence that James' most recent trip from Michigan to Ohio occurred on November 17, 2020, a mere three days before the warrant was executed. (*Id*. ¶ 8.) Moreover, there was evidence that officers had recently seized large quantities of THC-based products and United States currency from James Eubank, a known associate of James, who had recently traveled from another Michigan facility to James' Coventry residence. (*Id*. ¶ 4.) This evidence, separately or collectively, supports a reasonable probability that James and/or an associate recently transported the drugs from Michigan to James' residence at 1698 Coventry.

Such a conclusion is fortified by the two suspected drug transactions officers witnessed at the residential structure on November 16, 2020 and November 18, 2020—four and two days before the search, respectively. (*Id*. ¶¶ 13, 16.) According to the affidavit, the building contains a side door that was utilized by both James and Saunt. (*Id*. ¶ 15.) On November 16, 2020, officers observed an unknown man in a hoodie that appeared to have nothing in the pockets enter the structure through the side door. A short time later, the man was observed leaving "carrying a large bulging item in the pocket of his sweatshirt." (*Id*. ¶ 13.) The affiant averred that this "in and out behavior" was consistent with drug trafficking. (*Id*.) The second suspected buy, occurring

two days later, followed the same pattern with an unknown man carrying "what appeared to be an empty back pack" enter the side door and ten minutes later leave with the same back pack. Again, the affiant confirmed that this behavior was "indicative of a drug trafficking offense." (*Id*. ¶ 16.) At least with respect to the second suspected buy, the affidavit also provided that both James and Saunt were in the building at the time and had been observed interacting with each other throughout the day. (*See id*. ¶¶ 15–16.) These events, as witnessed by law enforcement, also support a reasonable finding that James was using his residence to facilitate his on-going drug trafficking operation.

Viewing the "totality of the circumstances," *Florida v. Harris*, 568 U.S. 237, 244, 133 S. Ct. 1050, 185 L. Ed. 2d 61 (2013), through the "lens of common sense," as the Supreme Court has instructed, *id*. at 248, these facts collectively give rise to probable cause to believe that a search of 1698 Coventry would uncover evidence of drug trafficking. It is, therefore, unnecessary to evaluate whether the trash pulls, which yielded evidence limited to Saunt, supported a search of James' residence.

## C.  *Leon's* Good Faith Exception

Even if the affidavit failed to provide probable cause for the warrant (which the Court concludes it did), the good faith exception announced in *Leon* would still apply. Once again, the Court turns to the Sixth Circuit's recent decision in *Reed* for direction. In *Reed*, the court did not ever reach the question of whether there was a sufficient nexus between the alleged drug activity and the residence to support probable cause. Instead, the government argued, and the Sixth Circuit found, that the district court's exclusion of the evidence was improper under *Leon's* exception, providing four reasons for its conclusion.

15

As an initial matter, the court found that the affidavit at issue established "two critical points." *Reed*, 993 F.3d at 451. The first point was that the "police had probable cause to believe that Reed was a drug dealer who had engaged in recent drug sales." *Id*. The second point was that "[t]he police had probable cause to believe that Reed lived at the home [that was searched]." *Id*. The court explained that even if these two points did not satisfy the nexus requirement for probable cause, they went "a long way toward showing that *Leon's* good faith exception applies." *Id*.

Next, the court determined that the affiant officer "could reasonably conclude that Reed's ongoing drug dealing sufficed to trigger [the Sixth Circuit's] 'well established' principle that if there is probable cause to suspect an individual of being an ongoing drug trafficker, there is a sufficient nexus between the evidence sought and that individual's home." *Id*. (quoting *United States v. Feagan*, 472 F. App'x 382, 392 (6th Cir. 2012)). The court observed that Sixth Circuit "precedent leaves unclear the amount of drug activity required to invoke this nexus principle[,]" noting that sometimes case law has suggested that there must be a large-scale operation, other times requiring recent, reliable evidence of drug activity. *Id*. (citing cases). Based on this "unsettled jurisprudence," the court in *Reed* found that the affiant officer did not "behave recklessly by relying on the state judge's conclusion that Reed's drug activity sufficed." *Id*. at 452 (collecting cases).

Third, the court observed that the officer affiant "did not rely on Reed's drug activity alone. His affidavit described his experience investigating drug crimes, noting that '[the officer] has participated in numerous drug arrests, drug seizures, and drug investigations during his career as a police officer.'" *Id*. (citing the affidavit). The court noted that, "[i]n many cases,

16

courts have highlighted an affiant officer's experience that drug dealers keep evidence of dealing at their residence' as an additional reason to find probable cause to search the drug dealer's home." *Id*. (quotation marks and citations omitted).

As a fourth and final reason, the court in *Reed* underscored that "when assessing the reasonableness [of an affiant officer's] conduct, [the court] cannot lose sight of 'the fact-intensive nature of the probable cause inquiry in known drug dealer cases[.]'" *Id*. (quoting *Brown*, 828 F.3d at 384.) "Because probable cause entails a deep dive into the totality of the circumstances, 'officers will often find it difficult to know how the general standard . . . applies in the precise situation encountered.'" *Id*. (quoting *District of Columbia v. Wesby*, -- U.S. --, 138 S. Ct. 577, 590, 199 L. Ed. 2d 453 (2018)). Noting that the "factual gradations" in these types of cases present challenges to trained jurists, the court asked "how can [the court] expect nonlawyer officers to know better than judges" how to navigate these "frothy nexus waters[.]" *Id*. (quotation marks and citations omitted).

The same four reasons would support an application of *Leon's* good faith exception in the present case had the warrant not also established probable cause. First, as outlined above, S.A. Prill's affidavit provided substantial evidence as to the "two critical points"; namely, that law enforcement had probable cause to believe that James was involved in recent drug trafficking activity and that he resided at 1698 Coventry. Second, S.A. Prill would have had reason to believe that this knowledge would invoke the well-established principle that evidence of criminal wrongdoing is likely to be found in an individual's home. Third, S.A. Prill was also entitled to rely on his experience involving drug trafficking, as set forth in the affidavit, to conclude that recent drug transactions had occurred at the residential structure to be searched and that drug

dealers are likely to keep evidence of their trafficking in their home, which would only serve to reinforce the officer's good faith belief that evidence of drug trafficking would be found in James' unit. Fourth, in light of the foregoing, and given the factually intensive nature of the inquiry, the Court finds that S.A. Prill's actions in relying on the warrant "fall within the range of reasonableness permitted by *Leon*." *Reed*, 993 F.3d at 452 (citing, among authority, *Wesby*, 138 S. Ct. at 590.) Thus, even setting aside the Court's conclusion that probable cause supported the warrant here, the reasoning in *Reed* leads to the inevitable conclusion that the search was constitutionally permissible under *Leon's* good faith exception.

### D.      James' Request for a *Franks* Hearing

Finally, James contends that the Court should set aside substantial portions of the affidavit under *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978), because it contains "false information or statements made with reckless disregard for the truth, and included significant material omissions." (Doc. No. 24 at 3.) In connection with this argument, he requests a *Franks* hearing.

A defendant is entitled to attack the validity of a search warrant, and the supporting affidavit, at an evidentiary hearing known as a *Franks* hearing, if he "(1) 'makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit,' and (2) 'the allegedly false statement is necessary to the finding of probable cause.'" *United States v. Green*, 572 F. App'x 438, 441 (6th Cir. 2014) (quoting *United States v. Graham*, 275 F.3d 490, 505 (6th Cir. 2001)). But affidavits supporting a search warrant enjoy "a presumption of validity[.]" *Franks*, 438 U.S. at 171. "To mandate an evidentiary hearing, the challenger's attack must be more than

conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." *Id*. The Sixth Circuit has characterized this as a "heavy burden." *United States v. Bateman*, 945 F.3d 997, 1008 (6th Cir. 2019).

At the hearing, the Court permitted defense counsel to go through the affidavit, paragraph by paragraph, in an effort to identify and provide proof as to any false statements and material omissions. Yet counsel was only able, at best, to even identify one minor factual inaccuracy. In paragraph 9, the affidavit provided that, despite no "legitimate source of income", James was able to purchase a "2020 Ford F150 King Ranch, [and] pay high utility bills[.]" (Doc. No. 24-1, Ex. A, ¶ 9.) Counsel insisted, without support, that this statement was a deliberate falsehood because James purchased a 2020 Ford F150 XLT, not the "King Ranch" model. There are two problems with this representation. First, unsubstantiated representations of counsel are insufficient to impeach the officer's description of the vehicle. *See Butler v. City of Detroit*, 936 F.3d 410, 419 (6th Cir. 2019) ("We have never said that a [party] shows 'deliberate falsehood' by simply contradicting a warrant affidavit."); *see also United States v. Shaffer*, 238 F. Supp. 3d 913, 921 (E.D. Ky. Mar. 3, 2017) ("[T]he *Franks* presumption of validity of an affidavit supporting a search warrant cannot be overcome by a self-serving statement which purports to refute the affidavit.") (quoting *United States v. Reed*, 726 F.2d 339, 342 (7th Cir. 1984)).

More fundamentally, the Sixth Circuit has held that "there must be evidence of more than mere factual inaccuracy to overcome *Franks*[.]" *Butler*, 936 F.3d at 420 (collecting cases from other circuits). Specifically, "there must [also] be evidence going to the officer's knowledge or state of mind at the time the officer wrote the allegedly false affidavit." *Id*. (collecting cases).

James offers no specific, nonconclusory evidence that S.A. Prill believed his affidavit was false or recklessly disregarded the truth as to the model of the truck or any other information contained in the affidavit. Indeed, regardless of any mistake as to the model of the vehicle, the fact that James bought *any* new truck without a legitimate means of income would have been indicative of criminal activity. The factual error was neither material nor suggestive of an intent to mislead.[6]

In an effort to try to meet this requirement, defense counsel suggested that the affidavit employed confusing language relative to the living arrangements of the multifamily residence on Coventry Road. For example, he noted that paragraph 10 provided that "Both James and Saunt reside in the multifamily residence of 1696 and 1698 Coventry Road. Though there are different addresses associated with this residence [sic] is known to be one residential structure." (Doc. No. 24-1, Ex. A, ¶ 10.) There is nothing inaccurate or false about these statements as the building represented one residential structure that contained multiple units with separate addresses.

Nevertheless, counsel complained that the language suggested either that James and Saunt lived together or that James lived at 1696 Coventry and Saunt lived at 1698 because James' name appeared first. Yet, several paragraphs later, the affiant made clear that tenant information filed with the City of Cleveland Heights reflects that "suspect Aaron James utilize [sic] the address of 1698 Coventry Road and that suspect Zoli Saunt utilizes the address of 1696 Coventry Road," even though "both of these addresses are part of the same residential

---

[6] At the hearing, the government acknowledge that the affidavit contained a second factual inaccuracy. In paragraph 14, the affiant reported that the third trash pull yielded "*documents* identifying Saunt as an occupant of the home." (*Id.* ¶ 14 (emphasis added).) The government explained that while the paragraph identified "documents," it should have said there were "mailings" associated with Saunt. The purpose of the paragraph was to tie Saunt to 1696 Coventry. The use of the word "mailings" would have accomplished the same thing. Accordingly, this factual misstatement was neither material nor evidence of an intent to deceive.

structure[.]" (*Id*. ¶ 17.) There is nothing about these true and accurate statements that suggests that the affiant deliberately attempted to mislead the issuing judge.

And while counsel believes that the affidavit should have repeated the fact that 1696 Coventry was rented by Saunt and 1698 was rented by James each time the structure was mentioned for purposes of clarity or should have used other language to describe the units, the Court examines the affidavit for what it contains, not for what it lacks, or what counsel thinks it should contain. *See Allen*, 211 F.3d at 975 (noting that the affidavit is "judged on the adequacy of what it does contain, not on what it lacks, or what a critic might say should have been added"). In particular, at the hearing defense counsel was critical of the fact that the affidavit on eight occasions described the place to be searched simply as a "residence" or "home." Counsel speculated that this terminology may have misled the issuing judge into believing that there was only one unit or that both men lived together in both units. The Court does not share counsel's concern that the language of the warrant is confusing, as it is clear that there is one residential structure with three separate units with James residing at 1698 Coventry and Saunt residing at 1696 Coventry.

Of course, counsel's argument regarding possible confusion would only carry weight if each paragraph was considered in a vacuum. However, the Court views the affidavit as a whole, looking to the totality of the circumstances. *See Abboud*, 438 F.3d at 571. Under such a holistic review, the Court finds no evidence that the language describing the residential structure was unclear, let alone false or knowingly and intentionally made with reckless disregard for the truth.

Likewise, counsel's desire to cross-examine the affiant officer as to his word choice or on aspects of the underlying investigation—something James mentioned in his motion and

counsel reiterated at the hearing—falls short of demonstrating entitlement to a *Franks* hearing. *See Franks*, 438 U.S. at 171 (an evidentiary hearing is not required when a defendant merely wishes to cross-examine government witnesses); (*see, e.g.,* Doc. No. 28 at 8 (James suggests that "[a] *Franks* [h]earing would be a great opportunity for this affiant to answer [questions regarding the trash pulls]").)

As one final piece of evidence of deliberate falsehoods, defense counsel pointed to paragraph 3 wherein the affiant referenced the Island Resort LLC "at which James maintains *illegal* grow operations and a THC extraction lab." (Doc. No. 24-1, Ex. A, ¶ 3 (emphasis added).) At the hearing, counsel insisted that this statement was false because "everyone knows that marijuana is legal in Michigan." Yet, the affidavit is clear that the Michigan grow operations were a "routine source of supply for drug dealers in Northeast Ohio." (*Id*. ¶ 2; *see also id*. ¶ 5 (representing that "there is no market for marijuana in the State of Michigan and that the products produced at the identified location are distributed within the State of Ohio").) Regardless of whether facilities in the State of Michigan may obtain licenses for cultivation/sale of marijuana products in Michigan, it would still be illegal to cultivate marijuana in Michigan for sale in Ohio. Setting aside the fact that James has come forward with no offer of proof that the grow operations in Michigan were licensed for sale in Michigan, the affidavit is clear that the

facilities in question were a source of illegal sales in Ohio.[7] There is nothing misleading or deceptive about this language.[8]

At bottom, defense counsel's unsupported arguments and suggestions for more concise and exacting language fall short of meeting the obligation under *Franks* to make a "substantial preliminary showing" that any statement in the affidavit was "false" or "knowingly and intentionally [made] . . . with reckless disregard for the truth." *Franks*, 438 U.S. at 155. James' motion for a *Franks* hearing, therefore, is denied, and the Court finds no basis to excise portions of the affidavit.

---

[7] In a related argument, counsel posited that paragraph 9's representation that James had no "legitimate source of income" was false and contradicted by other paragraphs that provided James worked in the Michigan grow facilities. Again, the representations in the affidavit that the Michigan grow operations were illegal enjoy "a presumption of validity[,]" that is not overcome by counsel's unsupported suggestion that these facilities might have been legitimate. *Franks*, 438 U.S. at 171. While James is free to make this argument at trial, it is not a basis for suppression.

[8] James complains that the paragraph describing the third trash pull contained a deliberate falsehood because it stated that the search revealed evidence of trafficking when the amounts were only suggestive of personal drug use. (Doc. No. 24-1, Ex. A, ¶ 14.) James also takes issue with some of the language used by the affiant to describe the proceeds from the trash pulls. For example, he points to the paragraph describing the second trash pull as yielding "cut vacuum sealed bags that had previously contained marijuana." (*See id.* ¶ 12.) At the hearing, counsel argued that a more accurate description would have been "pieces of plastic" or the "tops" of plastic bags. Of course, counsel's post-drafting attempts at wordsmithing the affidavit fail to demonstrate that the original author harbored a deliberate intent to deceive. And, in any event, the Court has already determined that the paragraphs relating to the trash pulls were unnecessary to the probable cause determination to search 1698 Coventry, making James' *Franks* arguments relating to the trash pull paragraphs moot. *See United States v. Wilson*, 501 F. App'x 416, 422 (6th Cir. 2012) (Defendant was not entitled to a *Franks* hearing because, even if the false statements were redacted, the remaining information in the affidavit "provided a sufficient nexus to cocaine trafficking [at the residence] to support probable cause for the search warrant").

### III. CONCLUSION

The Court finds that there was probable cause to support the search. Because the search did not violate James' rights under the Fourth Amendment, there is no basis to exclude from trial the evidence seized by law enforcement. Accordingly, for the foregoing reasons, and the motion to suppress is DENIED in its entirety.

**IT IS SO ORDERED**.

Dated: March 22, 2022

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

24